**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **GABBI LEMOS,** | CASE NO. 15-cv-05188-YGR |
| Plaintiff, | |
| vs. | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| **COUNTY OF SONOMA, ET AL.,** | Re: Dkt. No. 60 |
| Defendants. | |

Plaintiff Gabrielle Lemos ("Lemos") brings this action against defendants the County of Sonoma ("County"), Sheriff Steve Freitas, and Deputy Marcus Holton alleging claims for violation of her civil rights under 42 U.S.C. Section 1983 based on an incident on June 13, 2015 in which she claims Deputy Holton used excessive force as he attempted to arrest her for resisting, obstructing, or delaying a peace officer in the performance or attempted performance of his duties in violation of California Penal Code Section 148(a). Defendants now move for summary judgment on the grounds that plaintiff's claims are barred by the *Heck* doctrine, as set forth in *Heck v. Humphry*, because they necessarily implicate the invalidity of her underlying criminal conviction for violation of Section 148(a). (Dkt. No. 60 ("MSJ") at 1 (citing 512 U.S. 477 (1994)).)

Having carefully reviewed the pleadings, the papers and evidence submitted, as well as oral argument from counsel on January 8, 2019, and for the reasons set forth more fully below, the Court **GRANTS** defendants' motion for summary judgment.[1]

---

[1] Accordingly, the Court **DENIES AS MOOT** parties' stipulation to continue fact and expert discovery deadlines, deadline to complete early neutral evaluation, and deadline to file dispositive motions. (Dkt. No. 73.)

## I. BACKGROUND

On June 13, 2015, Deputy Holton was on patrol, dressed in his full Sheriff's uniform. (Dkt. No. 71-2 ("Def. Reply Statement") No. 1.) He wore a body camera fixed to the center of his chest. (*Id.*) At approximately 11:00 p.m. on June 13, 2015, Holton was driving on Liberty Road, which was a dark, rural, country road with one lane in each direction. (*Id.* No. 2.) The area was very dark with no streetlights. (*Id.* No. 3.) When Holton arrived at 684 Liberty Road, he saw a pickup truck with a large trailer attached carrying a race car. (*Id.* No. 4.) The truck had its headlines on, and it was stopped, blocking the southbound lane of traffic in violation of the vehicle code. (*Id.*)

Holton shined his vehicle spotlight on the truck and saw it was unoccupied. (*Id.* No. 5.) He then saw a male and another person walking towards the truck. (*Id.*) Holton rolled down his window and heard people screaming and yelling, including screaming about some type of fight. (*Id.* No. 6.) During Lemos's trial, Holton testified that because he had heard people yelling, he was obligated to investigate to determine whether a crime was in progress and if anyone needed assistance. (*Id.* No. 7.) Holton exited his vehicle to investigate a possible violation of law and activated his worn body camera. (*Id.* No. 8.) Once Holton encountered the parties, he wanted to separate them to speak with them individually and determine what was happening. (*Id.* No. 9.) A male later identified as Darien Balestrini sat in the driver's seat of the truck, and Holton asked him to exit the truck. (*Id.* No. 10.) Balestrini cooperated, exited the truck, provided his identification, and explained that his girlfriend was drunk, had misplaced her cell phone, and was crying. (*Id.* No. 11.) Balestrini denied that he and his girlfriend were fighting. (*Id.* No. 12.)

Police practice in such situations is to separate the parties and speak to them individually to encourage parties to speak freely without the influence of another person. (*Id.*) After speaking with Balestrini, Holton walked around to the passenger side of the vehicle and encountered three females standing outside the vehicle, later identified as plaintiff Gabrielle Lemos, her mother Michelle ("mother"), and her sister Chantal ("sister").[2] (*Id.* No. 13.) Holton asked Lemos, her

---

[2] Defendants aver that all three women started screaming at Holton. (*Id.* No. 13.) Plaintiff

2

mother, and her sister to step away from the vehicle so that he could speak to the female subject, later identified as Karli Labruzzi, who sat in the front seat of the truck. (*Id.* No. 15.) The door of the truck was closed, and the female subject leaned out of the window with her cell phone and stated that she had lost her cell phone and that there was no fight. (*Id.*) Holton could not yet determine whether a domestic related incident had occurred or who might be a suspect or a victim. (*Id.* No. 16.) Holton tried to speak with the female subject, but Lemos, her mother, and her sister continued to be very disruptive. (*Id.*)

Holton opened the truck door to speak to the female subject and to observe whether she had any weapons or visible injuries to her person. (*Id.* No. 17.) Lemos then inserted herself between Holton and the open vehicle door.[3] (*Id.* No. 18.) As Lemos inserted herself, she yelled at and pointed her finger at Holton, claiming that he could not do what he was doing. (*Id.* No. 19.) Holton responded by pushing Lemos away from him with his right hand. (*Id.* No. 20.) Lemos's mother moved Lemos away, and Holton closed the truck door. (*Id.* No. 21.) Lemos's mother and sister then shielded Lemos from Holton and refused to allow Holton to speak with her.[4] (*Id.* No. 23.) Holton could not determine what the three women were saying. (*Id.* No. 24.) They refused to calm down, and Holton was unable to explain the situation to them. (*Id.*) Because of their continued uncooperative behavior, Holton requested expedited backup to assist him in controlling the situation. (*Id.* No. 25.) Loud aggravated screaming could be heard in the background of Holton's transmission requesting expedited backup. (*Id.* No. 26.) During trial,

---

contends that Holton was the one yelling. (*Id.*)

[3] Defendants aver that Lemos "suddenly forced herself between Holton and the truck passenger door, smashing into Holton on the gun side of his body and stood pressed against Holton's body." (*Id.* No. 18.) They further contend that Lemos's actions were threatening to Holton because officers are trained to prevent people from being on their gun side to avoid exposing their weapon to them or allowing them an opportunity to grab their gun, and it caused Holton to believe that Lemos was going to be assaultive. (*Id.*) Plaintiff points to the difference in size and attire between Lemos and Holton to suggest that plaintiff's actions could not have threatened Holton. (*Id.*)

[4] Plaintiff asserts that her family so shielded her "after [Holton] pushed her by her neck, attempted to grab her, and drew his Taser." (*Id.* No. 23.)

3

Holton testified to his belief that the situation was dangerous because he was alone and outnumbered, Lemos and her family were uncooperative, the situation was volatile and still progressing, and he still did not know what was going on or whether a domestic incident had occurred.[5] (*Id.* No. 27.)

Holton repeatedly told the women to please calm down, he tried to separate the group and explain to them that he was investigating a possible domestic-related incident. (*Id.* No. 28.) Deputy Dillion arrived on the scene to assist Holton. (*Id.* No. 29.) Lemos, her mother, and her sister continued to scream and yell at Dillion. (*Id.*) Holton tried to calm the group and tried to separate the mother from the group to explain the investigation, but she kept returning to the group and yelling. (*Id.* No. 30.) Holton and Dillion could not control the group.[6] (*Id.* No. 31.) One could hear additional police sirens approaching, and it was apparent that additional officers would soon arrive on the scene. (*Id.* No. 32.)

Lemos's mother told her to go into the house at which point Lemos turned to walk away towards the house. (*Id.* No. 33.) Holton had not cleared the house.[7] (*Id.* No. 34.) As Lemos walked past Holton, he told her "Hey, come here. Hey." (*Id.* No. 35.) Lemos did not respond and continued to walk away. (*Id.*) Holton then ran up behind Lemos, grabbed her, and brought her to the ground.[8] (*Id.* No. 36.) Once Lemos was on the ground, she continued to scream and resist.

---

[5] Plaintiff asserts that Holton did not possess such a belief. (*Id.* No. 27.)

[6] Defendants contend that the situation was therefore volatile and dangerous for the officers. (*Id.* No. 31.) Plaintiff disputes that characterization. (*Id.*)

[7] Defendants contend that Holton feared that if Lemos returned to the house she could arm herself, flee, barricade herself inside, or a myriad of other possibilities. (*Id*. No. 34.) Plaintiff disputes that Holton had a genuine, reasonable fear that Lemos would so act. (*Id.*)

[8] Plaintiffs contend that Holton grabbed Lemos by the back of the neck, picked her up off the ground, threw her into the ground face-first, and rubbed her face into the gravel. (*Id.* No. 36.) Defendants aver that Holton ran up behind Lemos and grabbed her left wrist with both of his hands, Lemos pulled her left arm to the right and twisted to get away from Holton and prevent him from handcuffing her. (*Id.* No. 36.) Defendants also aver that Lemos was taken to the ground to decrease the chance of injury to her, the offices, and others. (*Id.* No. 37.) Plaintiff argues that Holton took Lemos to the ground to hurt her. (*Id.*)

4

(*Id.* No. 38.) She had her hands underneath her body and refused to put her hands behind her back.[9] (*Id.*) Holton managed to get on top of Lemos, straddling her with one knee on each side of her body, and finally managed to handcuff her. (*Id.* No. 39.) Lemos's mother ran up to Holton and kicked him and grabbed the back of his collar.[10] (*Id.* No. 40.) Holton yelled "Get off me. Get back!" and pushed up to try to get her off of him. (*Id.* No. 41.) Deputy Dillion took control of plaintiff's mother and pulled her off. (*Id.*) Approximately ten minutes elapsed from the time Deputy Holton arrived and first contacted Lemos to the time Holton finally gained control of Lemos. (*Id.* No. 42.) Holton asked Lemos if she was injured and she responded with an expletive and laughed. (*Id.* No. 43.) Lemos was transported to the hospital for medical clearance, where she told Holton that she had drank three Jack Daniels and colas that night.[11] (*Id.* No. 44.) During the physical confrontation with Lemos, Holton's hat fell off and his body worn camera detached from his shirt. (*Id.* No. 45.) Because of the incident, Holton sustained injuries to his left knee and the right side of his neck. (*Id.*)

On August 31, 2016, Lemos was convicted by a jury for violating California Penal Code Section 148(a)(1). (*Id.* No. 48.) The instructions provided that the jury find each of the following elements beyond a reasonable doubt:

1. Deputy Marcus Holton was a peace officer lawfully performing or attempting to perform his duties as a peace officer;
2. The defendant willfully resisted, obstructed, or delayed Deputy Marcus Holton in the performance or attempted performance of

---

[9] Defendants aver that Holton did not know whether plaintiff had a weapon in her waistband. (*Id.* No. 38.) Plaintiff characterizes this belief as unreasonable given Lemos's attire of yoga pants. (*Id.*)

[10] Defendants say Lemos's mother kicked Holton in the face and shoulder area and grabbed his collar to try to prevent Lemos's arrest. (*Id.* No. 40.) Plaintiff contends that her mother kicked Holton in his backside with a sandaled foot and grabbed his collar in order to pull him off of Lemos. (*Id.*)

[11] Defendants contend that Lemos also told Holton that her sister Karli, the female subject, and Balestrini were involved in a domestic-related incident, although no physical altercation appeared to have occurred. (*Id.* No. 44.) Plaintiff disputes this characterization and says that she told Holton that the couple had been "bickering" and that there had been nothing physical between them. (*Id.*)

5

those duties; AND
3. When the defendant acted, she knew, or reasonably should have known, that Deputy Marcus Holton was a peace officer performing or attempting to perform his duties.

(Dkt. No. 70-1, Exhibit A at 9-10.) With respect to the first element, the judge further instructed that "[a] peace officer is not lawfully performing his or her duties if he or she is unlawfully arresting or detaining someone or using unreasonable or excessive force in his or her duties." (*Id.* at 10.) With respect to the second element, the court provided four alternative theories by which the jury could find Lemos guilty, namely that she: (1) made physical contact with the deputy as he was trying to open the truck door; (2) placed herself between the deputy and the female subject; (3) blocked the deputy from opening the truck door and seeing or speaking with the female subject; and (4) pulled away from the deputy Holton when he attempted to grab her. (*Id.*) The court further instructed the jury that they could not find Lemos guilty unless they all agreed that Lemos committed at least one of these alleged acts. (*Id.* No. 49.)

The jury unanimously found Lemos guilty and used a general verdict forms, which did not require the jury to specify which theory or theories they agreed-upon with respect to the second element. (*Id.* No. 50.)

## II. LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery, and affidavits demonstrate that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if it could reasonably be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material where it could affect the outcome of the case. *Id.*

The party moving for summary judgment has the initial burden of demonstrating the absence of a genuine issue of material fact as to an essential element of the nonmoving party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Once the movant has made this showing, the burden shifts to the nonmoving party to identify specific evidence showing there is a genuine issue of material fact for trial. *Id.* If the nonmoving party cannot do so, the movant "is entitled to . . . judgment as a matter of law because the nonmoving party has failed to make a

United States District Court
Northern District of California

6

sufficient showing on an essential element of her case." *Id.* (internal quotations omitted).

On summary judgment, the court draws all reasonable factual inferences in favor of the nonmoving party. *Anderson*, 477 U.S. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738–39 (9th Cir. 1979).

### III. ANALYSIS

Defendants aver that Lemos's excessive force claims under Section 1983 necessarily implicate the validity of her criminal conviction for violation of California Penal Code Section 148 for resisting, obstructing, or delaying Holton in the performance or attempted performance of his duties, and therefore, her claims are barred by the *Heck* doctrine. (MSJ at 8.) When a plaintiff "seeks damages in a [Section] 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.[12] *Heck*, 512 U.S. at 486-87. Therefore, "if a criminal conviction arising out of the same facts stands and is fundamentally inconsistent with the unlawful behavior for which [S]ection 1983 damages are sought, the 1983 action must be dismissed." *Cunningham v. Gates*, 312 F.3d 1148, 1153 (9th Cir. 2002) (internal citation omitted).

---

[12] Notably, the Supreme Court in *Heck* cited to the following as an example of "a [Section] 1983 action that does not seek damages directly attributable to conviction or confinement but whose successful prosecution would necessarily imply that the plaintiff's criminal conviction was wrongful" and as a result "the [Section] 1983 action will not lie":
> An example . . . would be the following: A state defendant is convicted of and sentenced for the crime of resisting arrest, defined as intentionally preventing a peace officer from effecting a *lawful* arrest . . . . He then brings a § 1983 action against the arresting officer seeking damages for violation of his Fourth Amendment right to be free from unreasonable seizures. In order to prevail in this § 1983 action, he would have to negate an element of the offense of which he has been convicted.

*Heck*, 512 U.S. at 503 n. 6 (emphasis in original).

7

Under Section 148(a)(1), "[t]he legal elements of a violation . . . are as follows: (1) the defendant willfully resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in the performance of his or her duties, and (3) the defendant knew or reasonably should have known that the other person was a peace officer engaged in the performance of his or her duties." *In re Muhammed C.*, 95 Cal.App.4th 1325, 1329, 116 Cal.Rptr.2d 21 (2002) (citations omitted). A conviction under Section 148(a)(1) can be valid even if, during a single continuous chain of events, some of the officer's conduct was unlawful. *Yount v. City of Sacramento*, 43 Cal.4th 885, 76 Cal.Rptr.3d 787, 183 P.3d 471 (2008). "It is sufficient for a valid conviction under [Section] 148(a)(1) that at some time during a 'continuous transaction' an individual resisted, delayed, or obstructed an officer when the officer was acting lawfully. It does not matter that the officer might also, at some other time during that same 'continuous transaction,' have acted unlawfully." *Hooper v. County of San Diego*, 629 F.3d 1127, 1132 (9th Cir. 2011).

The Ninth Circuit has "recognized that an allegation of excessive force by a police officer would not be barred by *Heck* if it were distinct temporally or spatially from the factual basis for the person's conviction." *Beets v. County of Los Angeles*, 669 F.3d 1038 (9th Cir. 2012) (citing *Smith v. City of Hemet*, 394 F.3d 689, 695 (9th Cir. 2005)). Stated differently, a *Heck* bar does not lie when the conviction and the Section 1983 claim are based on different actions that occurred during "one continuous transaction." *See Hooper*, 629 F.3d at 1133. Thus, in *Beets,* the Ninth Circuit found that one could not separate the criminal actions that formed the basis of the underlying conviction and the alleged use of excessive force because it was the officers' use of force "that brought an end" to the criminal activity. *Beets*, 669 F.3d at 1044-45. By contrast, in *Hooper*, the defendant officer's alleged use of excessive force occurred *after* he had already gained control over the plaintiff and had "gotten both of Hooper's hands behind her back." *Hooper*, 629 F.3d at 1129. Only after Hooper had "stopped resisting when [the officer] instructed her to do so[,]" did the officer instruct his department issue canine to "[c]ome here[,]" after which the dog bit and held Hooper's head, resulting in loss of large portions of Hooper's scalp. *Id*. Based on this distinction, the Ninth Circuit in *Hooper* determined that the criminal conduct of the underlying conviction and the alleged use of excessive force were "different actions during one

8

continuous transaction." *Id.* at 1134 (internal quotations omitted). Moreover, the court emphasized that a jury verdict, unlike a plea, "necessarily determines the lawfulness of the officers' actions throughout the whole course of the defendant's conduct," so that a subsequent Section 1983 excessive force action brought by the defendant "would necessarily imply the invalidity of his conviction." *Id.* at 1045 (internal quotation marks omitted).[13]

Here, it is undisputed that the jury found that Holton did not use "excessive force" when he engaged in his duties, i.e. the first element of Lemos's Section 148(a) conviction. As in *Beets*, the jury that convicted Lemos was required to find "that: 1. Deputy Marcus Holton was peace officer lawfully performing or attempting to perform his duties as a peace office . . . ." (*See* Dkt. No. 70-1, Exhibit A at 9.) The jury could not so find in circumstances where Holton was "unlawfully arresting or detaining someone or using unreasonable or excessive force in his . . . duties." *See id.* at 10.[14]

Thus, a *Heck* bar would not lie if the basis for the Section 1983 claim "were distinct temporally or spatially from the factual basis for the person's conviction" or Section 1983 claim and the conviction were based on different actions that occurred during the one continuous transaction. The Court finds that the undisputed facts of this case do not support either approach.

The Court finds that plaintiff's conduct of resisting, obstructing, or delaying Holton in his performance of his duties continued for the 10-minute period, that is, it began when Lemos first

---

[13] Since *Beets*, courts in this district have held that a Section 148(a)(1) conviction obtained by jury verdict barred a subsequent Section 1983 action for excessive force. *See Lozano v. City of San Pablo*, No. 14–cv–00898–KAW, 2014 WL 4386151, at *6 (N.D. Cal. Sept. 4, 2014) ("The jury verdict in the state court proceedings brings this case squarely in line with *Beets*."); *Tarantino v. City of Concord*, No. 12–cv–00579–JCS, 2013 WL 3722476, at *3 (N.D. Cal. July 12, 2013) (holding that plaintiff's convictions at trial for assault on a peace officer and violation of section 148(a)(1) barred plaintiff's excessive force claims where the jury made special findings that plaintiff "initiated a physical altercation" with the officers and "did not act in self-defense"); *Box v. Miovas*, No. 12-cv-04347-VC (PR), 2015 WL 192273317, at *6 (N.D. Cal. April 28, 2015) ("The facts in this case are like those in *Beets*. Box was found guilty of violating § 148(a)(1) by a jury. . . . Therefore, pursuant to *Beets*, Box's claim for excessive force is barred by *Heck*.") In *Kyles v. Baker*, Judge Orrick adopted this reasoning to hold that because a plaintiff was convicted by a plea of no contest, not by a jury trial, his conviction did not necessarily determine the lawfulness of the officers' actions throughout the whole course of plaintiff's conduct. 72 F.Supp.3d 1021, 1037 (2014).

[14] *See also Beets*, 669 F.3d at 1045; *Lozano*, 2014 WL 4386151, at *6; *Tarantino*, 2013 WL 3722476, at *5; *Box*, 2015 WL 192273317, at *6.

9

inserted herself between the officer and the open vehicle door and did not cease until Holton gained control of Lemos after taking her to the ground and placing her in handcuffs. (*See* Def. Reply Statement Nos. 18-42.) Throughout the interaction Lemos continued to scream at Holton and failed repeatedly to comply with his instructions. (*See e.g., id.* Nos. 24, 28, 29, 31.) The situation was exacerbated by her mother's conduct and interference. Given plaintiff's and her cohorts' continuous screaming and provoking, with respect to Holton's actions, the Court finds no temporal or spatial distinction or other separation between the conduct for which Lemos was convicted, by a jury, and the conduct which forms the basis of her Section 1983 claim. Holton did not bring the situation under control until he brought Lemos to the ground and secured her hands. (*See id.* Nos. 39, 42.) Lemos has not and cannot allege that Holton used excessive force thereafter. Accordingly, for *Heck* purposes, the Court finds Holton's actions to form one uninterrupted interaction and the jury's finding that he did not use excessive force would be inconsistent with a Section 1983 claim based on an event from that same encounter. Accordingly, the Court finds that Lemos's claims are barred by the *Heck* doctrine.

### IV. CONCLUSION

For the reasons stated above, the Court **GRANTS** defendants' motion for summary judgment.

This Order terminates Docket Numbers 60 and 73.

**IT IS SO ORDERED.**

Dated: January 29, 2019

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

10